**E. E. BLACK, LTD., General Contractors Association of Hawaii, and Hawaii Employers Council, Plaintiffs,**

v.

**F. Ray MARSHALL, Secretary of the United States Department of Labor; Donald E. Elisburg, Assistant Secretary for Employment Standards of the Department of Labor; Weldon J. Rougeau, Deputy Assistant Secretary and Director, Office of Federal Contract Compliance Programs; and Carin A. Clauss, Solicitor of Labor, United States Department of Labor, Defendants.**

**Civ. No. 79–0132.**

United States District Court, D. Hawaii.

Sept. 5, 1980.

Jared H. Jossem, Barry W. Marr, Howard A. Matsuura,* Honolulu, Hawaii, for plaintiffs.

Melvin K. Soong, Asst. U. S. Atty., Walter M. Heen, U. S. Atty., Honolulu, Hawaii, Maimon Schwarzschild,** U. S. Dept. of Justice, Civil Rights Div., Washington, D. C., for defendants.

## DECISION AND ORDER

SAMUEL P. KING, Chief Judge.

### I. FACTS

This case of first impression involves the construction and interpretation of several sections of the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et seq.* (1976 & Supp. III 1979), and appurtenant regulations. Section 503 of the Act, 29 U.S.C. § 793 (Supp. III 1979) (as amended) reads in pertinent part:

> Any contract in excess of $2,500 entered into by any Federal department or agency for the procurement of personal property and non–personal services (including construction) for the United States shall contain a provision requiring that, in employing persons to carry out such contract the party contracting with the United States shall take affirmative action to employ and advance in employment qualified handicapped individuals as defined in section 706(7) of this title.

29 U.S.C. § 706(7) (Supp. III 1979) reads in pertinent part:

> (A) Except as otherwise provided in subparagraph (B), the term "handicapped individual" means any individual who (i) has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment and (ii) can reasonably be expected to benefit in terms of employability from vocational rehabilitation services . . .

> (B) [T]he term "handicapped individual" means . . . any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment.

Pursuant to the Act, and Executive Order No. 11558, the Secretary of Labor issued regulations governing procedures for enforcing the Act, and also supplementing and defining certain of the terms contained

---

* Briefs of amici curiae supporting plaintiffs were filed by Judith K. Richmond, Chamber of Commerce of the United States, William L. Kovacs and Stephen A. Bokat, National Chamber Litigation Center, Washington, D. C., and by John A. Roney and Sidney J. Y. Wong, Honolulu, Hawaii and Guy Farmer, Washington, D. C., for National Electrical Contractors Ass'n.

** Briefs of amici curiae supporting defendants were filed by Marilyn Holle, Mary–Lynne Fisher, Monica Weil and Ken Brooks, Western Law Center for the Handicapped, Los Angeles, Cal., and Kent Hull, Director, Legal Services, National Center for Law & the Handicapped, Inc., South Bend, Ind.

in the Act. 41 C.F.R. § 60–741.2 defines a handicapped individual as any person who:
(1) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (2) has a record of such impairment, or (3) is regarded as having such an impairment. For purposes of this Part, a handicapped individual is "substantially limited" if he or she is likely to experience difficulty in securing, retaining or advancing in employment because of a handicap.

Appendix A to 41 C.F.R. § 60–741 includes employment in its definition of "major life activities." That Appendix also provides:

The phrase *"substantially limits"* means the degree that the impairment affects employability. A handicapped individual who is likely to experience difficulty in securing, retaining or advancing in employment would be considered substantially limited.

.     .     .     .     .

*"Is regarded as having such an impairment"* refers to those individuals who are perceived as having a handicap, whether an impairment exists or not, but who, because of attitudes or for any other reason, are regarded as handicapped by employers, or supervisors who have an effect on the individual securing, retaining or advancing in employment.

George Crosby is a thirty–one year old man who entered the apprenticeship program of the United Brotherhood of Carpenters in Honolulu in September 1973. The program involved on–the–job training and schooling designed to teach the basic carpentry skills necessary to become a journeyman. The job of carpenter's apprentice requires frequent bending, twisting and heavy lifting. The apprenticeship program required 8,000 hours of work in the field. Prior to starting the program, Mr. Crosby had worked packing and moving furniture and had also worked in the carpenter's union summer program. In high school Mr. Crosby had been active in basketball, cross–country and varsity football. He also played football for the University of Hawaii, and after college tried out for several professional football teams.

As an apprentice carpenter, Mr. Crosby worked for several construction contractors between September 1973 and May 1976. By May 1976, he had accumulated over 3600 hours of on–the–job training. During this time he had suffered two back–related problems. In March 1974 he strained his back while attempting to carry a load of lumber. The pain occurred in his lower left back around the beltline. He was treated for this injury for several months and collected $400 in workers' compensation benefits. In 1975, while attempting to put a concrete form in place, Mr. Crosby "felt a little discomfort" in his back. When he reported the incident he was sent to a doctor who examined and X–rayed his back, but could find nothing wrong. Mr. Crosby returned to work the same day.

On May 20, 1976, Mr. Crosby and several other apprentice carpenters were referred by the union to defendant E. E. Black, Ltd. (Black), a general construction contractor. Black required all apprentice carpenter applicants to take pre–employment physical examinations. Mr. Crosby had X–rays taken of his back, and Dr. George Henry, who read the X–rays, detected a congenital back anomaly, a partially sacralized transitional vertebra (also referred to as an "anomalous joint" or a "lumbosacral anomalous joint"). Dr. Henry told Black that because of this condition Mr. Crosby was a poor risk for heavy labor. Black denied Mr. Crosby employment on the basis of his pre–employment physical.

On June 4, 1976, Mr. Crosby was examined by Dr. Masao Takai, an orthopedist, who took X–rays, and found in addition to the anomaly mentioned above, a spina bifida occulta and a mild rotoscoliosis.[1] Dr. Takai concluded, after the examination, that Mr. Crosby's condition did not prevent him from performing the job of apprentice

---

1. Spina bifida occulta is an anomaly characterized by the defective closure of the bony encasement of the spinal cord. Rotoscoliosis is an anomaly which involves a narrowing of the disc space caused by a slight rotation of the spine.

carpenter, and wrote a letter addressed "to whom it may concern" stating that if Mr. Crosby kept his back and abdominal muscles in good tone, "he should be able to perform whatever he prefers." Though Mr. Crosby showed the letter to Black, he was never recalled for an apprentice carpenter position.

Mr. Crosby testified at a hearing before an Administrative Law Judge that after the Black incident, the union would not refer him to any jobs that had pre–employment physicals. During the period between 1976 and 1978 Mr. Crosby worked at several construction jobs. He testified before the Administrative Law Judge that because of the incident with Black he had had great difficulty obtaining employment as a carpenter's apprentice, and had been unable to get the on–the–job training hours required to become a journeyman.

In July 1976, Mr. Crosby filed a complaint with the State of Hawaii Department of Labor, which complaint was referred to the defendant United States Department of Labor. Mr. Crosby alleged that he had been refused employment as an apprentice carpenter by Black because of a congenital abnormality in his back.

41 C.F.R. § 60–741.5 requires government contractors holding a contract of over $50,-000 with the federal government, and having 50 or more employees, to adopt an affirmative action program. There is no dispute that Black at all relevant times had at least one contract with the federal government of over $50,000 and had more than 50 employees. 41 C.F.R. § 60–714.4 sets forth the affirmative action clause that must be included in all covered contracts, and 41 C.F.R. § 60–741.3 discusses covered contracts and waivers from the affirmative action requirements. That section exempts from coverage all contracts under $2500. There is no dispute that the contract in connection with which Crosby was rejected had a value of over $2500. 41 C.F.R. § 60–741.3 makes it clear that even if a particular contract has no connection with any of the contractor's federal contracts, it is a covered contract (if over $2500) unless

there is a specific waiver. Here, there was no waiver. Thus, the contract in connection with which Crosby was rejected was a covered contract.

It could be argued that by the terms of § 503, 29 U.S.C. § 793, only contracts related to federal contracts should be covered by the Act. Even if § 503 had to be read that way, the Secretary would still have to come up with a method of exempting unrelated contracts. He was certainly free to adopt a method that included all contracts initially, and required a contractor (with affirmative action obligations) to go through an affirmative waiver procedure to exempt unrelated contracts. The provision adopted in this regard, 41 C.F.R. § 60–741.3(5), provides:

Facilities not connected with contracts. The Director may waive the requirements of the affirmative action clause with respect to any of a prime contractor's or subcontractor's facilities which he or she finds to be in all respects separate and distinct from activities of the prime contractor or subcontractor related to the performance of the contract or subcontract, provided that he or she also finds that such a waiver will not interfere with or impede the effectuation of the Act. Such waivers shall be considered only upon the request of the contractor or subcontractor.

Such a provision is certainly valid. And while a contractor might have a right to quarrel with a particular determination of the Director, he cannot quarrel with a determination that he never requested.

The contract provision contained in 41 C.F.R. § 60–741.4 that each agency, contractor or subcontractor must include in all covered contracts, reads in pertinent part:

(a) The contractor will not discriminate against any employee or applicant for employment because of physical or mental handicap in regard to any position for which the employee or applicant is qualified. The contractor agrees to take affirmative action to employ, advance in employment and otherwise treat qualified handicapped individuals without discrimination based upon their physical or men-

tal handicap in all employment practices
. . . .

(b) The contractor agrees to comply with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Act.

(c) In the event of the contractor's noncompliance with the requirements of this clause, actions for noncompliance may be taken in accordance with the rules, regulations, and relevant orders of the Secretary of Labor issued pursuant to the Act.

Mr. Crosby's complaint was investigated by the Office of Federal Contract Compliance Programs (OFCCP) of the Department of Labor. That office found that Black had violated the Act and its implementing regulations, and on July 13, 1977 issued an administrative complaint. The complaint charged Black specifically with violating the Act and the contract provision set forth in 41 C.F.R. § 60–741.4, quoted above, by "failing and refusing to hire qualified handicapped individuals and by failing and refusing to take affirmative action to employ, advance in employment and otherwise treat qualified handicapped individuals without discrimination." The complaint also charged Black with violating the Act and the regulations by adopting physical and mental job qualification requirements contrary to 41 C.F.R. § 60–741.6(c), which mandates that such requirements, to the extent that they "tend to screen out qualified handicapped individuals . . . [be] job related and . . . consistent with business necessity and the safe performance of the job." Finally, the complaint charged Black with violating the Act and regulations by using the results of medical examinations in a manner which violated 41 C.F.R. § 741.6.[2]

A hearing was held in Honolulu in April 1978 before Chief Administrative Law

Judge H. Stephan Gordon. At the hearing the parties were afforded the opportunity to be heard, to introduce relevant evidence and to examine and cross–examine witnesses. A great deal of medical evidence was presented. In September 1978 Judge Gordon issued his decision. He first commented that "a review of [the medical] evidence reveals a sharp conflict among medical authorities on the relationship of unilateral sacralization of lumbar vertebra to low back injuries. However . . . this condition, as it exists in Mr. Crosby, in no way impairs his present ability to perform all the physical functions of a carpenter's apprentice. The medical dispute in this case is focused solely on whether this condition will tend to lead to back pain and injury in the future."

The Judge noted that the term "impairment" is nowhere defined in the Act or regulations, but he interpreted it as meaning "any condition which weakens, diminishes, restricts, or otherwise damages an individual's health or physical or mental activity." The Judge found that the Department had proved that Mr. Crosby was perceived to have an impairment, and that he experienced difficulty in obtaining employment because of this. However, the Judge found that the Department had not proved that the perceived impairment substantially limited a major life activity of Mr. Crosby—in this case, employment.[3] Hence, the Judge found that Mr. Crosby was not a handicapped individual and was not protected by the Act. *U.S. Dept. of Labor v. E.E. Black, Ltd.*, No. 77–OFCCP–7R (U.S. Dept. of Labor, Sept. 13, 1978), [hereinafter Administrative Law Judge's Decision].

The Judge determined that Congress was not attempting to protect people with *any* impairment, "merely the most disabling." He concluded that the Department had to

---

**2.** 41 C.F.R. § 741.6(c) provides in pertinent part: "Nothing in this section shall prohibit a contractor from conducting a comprehensive medical examination prior to employment provided that the results of such an examination shall be used only in accordance with the requirements of this section."

**3.** As discussed above, both the Act (29 U.S.C. § 706(7)(B) and the regulations (41 C.F.R. § 60–741.2) define handicapped individual as a person whose impairment substantially limits one or more major life activities.

demonstrate that Mr. Crosby's impairment was so severe as to limit employment generally. "To prove this, Plaintiff must demonstrate that the impairment, as of the time of the alleged discrimination, impeded activities relevant to many or most jobs." The Judge determined that since it had not been demonstrated that Mr. Crosby's perceived impairment had any present functional significance, " . . . it follows *a fortiori* that this impairment was not perceived as impeding activities indigenous to many or most jobs or as limiting any of Mr. Crosby's major life activities." The Judge went on to hold, however, that even if future functional significance was relevant in establishing that employment was substantially limited, the Department "still would not have met its burden in this case."

. . . Dr. Henry perceived Mr. Crosby's impairment as disqualifying him only for jobs involving heavy labor. While many jobs exist which could be classified as heavy labor, they are relatively few when measured as a percentage of all jobs available in the labor force. Accordingly, an impairment which disqualifies a person from performing heavy labor would not necessarily affect his ability to perform the vast majority of jobs. Yet it is only persons with impairments impeding their ability to perform many or most jobs (measured against the full spectrum of possible employments) who are likely to experience difficulty in securing, retaining, or advancing in employment because of handicaps. Therefore, since Mr. Crosby's impairment was perceived as limiting his access only to a relatively few jobs, it cannot be considered severe enough to qualify under the statutory definition.

*Id.* at 14.

The Judge also found that the pre–employment physical examination, used only for carpenter apprentice and laborer positions—both involving heavy labor—did not tend to screen out qualified handicapped individuals. He found that the job requirement bore a reasonable relation to jobs involving strenuous physical activity, and

was consistent with business necessity and safe job performance. He did not discuss, however, whether screening out individuals with Mr. Crosby's specific problem was permitted. No doubt this was because he felt that as he had already concluded that Mr. Crosby was *not* a handicapped individual, it could not possibly have been a violation of the Act and regulations for Black to have screened him out. The Judge recommended that the complaint be dismissed in its entirety.

The OFCCP filed exceptions to the Recommended Decision and Order with Donald Elisburg, Assistant Secretary of Labor, Employment Standards Administration. After denying a motion to disqualify the Secretary of Labor, the Department of Labor and himself, the Assistant Secretary issued a Decision and Order on February 26, 1979. *U.S. Dept. of Labor v. E.E. Black, Ltd.*, No. 77–OFCCP–7R (U.S. Dept. of Labor, Feb. 26, 1979). Though his view of the facts was almost identical to that of the Administrative Law Judge, his view of the law was different. He agreed with the Judge that the term "impairment" as used in the Act and regulations means "any condition which weakens, diminishes, restricts, or otherwise damages an individual's health or physical or mental activity." However, he took a much more expansive view of the meaning of "substantially limits one or more . . . major life activities." He found that coverage under the Act did not require a showing that the impairment impeded activities relevant to many or most jobs, but rather that protection "under the Act is extended to every individual with an impairment which is a current bar to employment which the individual is currently capable of performing. . . . It is sufficient that the impairment is a current bar to the employment of one's choice with a federal contractor which the individual is currently capable of performing." He also overruled the Judge's finding that since Mr. Crosby's handicap was perceived as having no present functional significance, it could not possibly have been perceived as impeding activities indigenous to many or most jobs.

He found that since the perceived impairment prevented Mr. Crosby from securing the job he wanted, Mr. Crosby was a handicapped individual under the definitions set forth in the Act and regulations. He further found that since Mr. Crosby, at the time he was denied employment, was currently capable of performing the job, he was a qualified handicapped individual as that term is used in 41 C.F.R. § 60–741.2.[4] Thus he found that Mr. Crosby was covered by the Act.

The Assistant Secretary also found that Black's affirmative action obligations were applicable to the job and contract for which Mr. Crosby was rejected.[5] The Assistant Secretary determined that Black had violated 41 C.F.R. § 60–741.6, by applying physical job requirements that 1) tended to screen out qualified handicapped individuals and 2) were not related to the specific job of apprentice carpenter. He, unlike the Administrative Law Judge, viewed the job requirement not as the pre–employment physical, but as Black's requirement that Mr. Crosby not have the back condition he did. He agreed with the Administrative Law Judge that in the abstract the requirement of a healthy back bears the needed relation to the job, but found that the key question was whether the disqualifying condition "evaluated Mr. Crosby's current capacity to perform the work of an apprentice carpenter." Since Mr. Crosby's condition, according to the Assistant Secretary, had at best only a potential for future significance, it could not be used to disqualify Mr. Cros-

by from the job. The Assistant Secretary also noted that even the judgment "of possible future significance was contradicted by other testimony and by medical studies containing scientific data and statistics supporting an opposite conclusion." He also rejected Black's argument that hiring someone with a great risk of future back injury was justified by business necessity because of the very high potential workers' compensation costs. "A policy of excluding potential employees to reduce an employer's costs shifts the financial burden to the rejected handicapped individual. This is contrary to the intent of protective statutes such as the Act." Black also argued that forcing it to ignore its doctor's recommendations made it violate its O.S.H.A. obligations. The Assistant Secretary found, however, that Black's "safety and health obligations . . . are not violated by the employment of an impaired individual who is capable of performing the particular job."

The Assistant Secretary ordered Black to offer Mr. Crosby a job as an apprentice carpenter, and also ordered it to stop using "non–job related physical qualification requirements which tend to screen out qualified handicapped individuals for the job of apprentice carpenter." There were various other provisions in the Order, and certain back pay and other matters were remanded to the Administrative Law Judge. Black was ordered to comply or be debarred from all government contracts.[6]

On March 16, 1979, plaintiffs Black, the Hawaii Employers Council[7] and the Gener-

---

4. That section reads: " 'Qualified handicapped individual' means a handicapped individual as defined in § 60–741.2 who is capable of performing a particular job with reasonable accommodation to his or her handicap."

5. Black contended that since the contract in question was with the State of Hawaii, and not the federal government, it acquired no affirmative action obligations. The Assistant Secretary, viewing the regulations regarding covered contracts and waiver discussed previously, made the determination that Black was covered by the affirmative action regulations, that the affirmative action clause was placed by operation of law into the contract between Black and

the State, and hence that Black had affirmative action obligations toward Mr. Crosby.

6. Enforcement of many of the orders of the Secretary, including that relating to debarment, have been stayed pending the resolution of this case.

7. The council is a Hawaii not–for–profit corporation having its principal office and place of business in Honolulu, where it represents several hundred employers, many of whom hold federal contracts, in labor, personnel and employee relations matters. The council was an intervenor in this case when the case was proceeding through the administrative process.

al Contractors Association of Hawaii, Inc.[8] filed this action for judicial review of the Assistant Secretary's decision. There is no question as to the Court's jurisdiction under the federal question provision, 28 U.S.C. § 1331 (1976).[9]

The plaintiffs' broad–based complaint attacks the Act, the regulations and the Order of the Assistant Secretary. Some of the many contentions of the plaintiffs are as follows: 1) the definition of handicapped individual contained in the Act is unconstitutionally vague, thus denying plaintiffs due process of law; 2) the regulations adopted pursuant to the Act, as well as the Order of the Assistant Secretary, are unconstitutionally vague, thus denying plaintiffs due process of law; 3) the Assistant Secretary illegally ruled on the motions to disqualify, thus rendering his Order null and void; 4) the Act, the regulations and the conduct of the defendants, taken together, constitute a taking from defendants without due process of law or just compensation, in violation of the Fifth Amendment; 5) the Order of the Assistant Secretary is unenforceable and void because (a) it disregards the requirement of the Act that only employment on government contracts is covered, (b) it fails to comply with applicable regulations by disregarding the "requirement" that the only conditions that can constitute impairments are those contained in the Guides of the American Medical Association, (c) it adopts, contrary to law, an incorrect standard for determining when an impairment substantially limits a major life activity, (d) it disregards the employer's right, under the regulations, to use physical job requirements consistent with business necessity and safe performance of the job, (e) it imposes remedies and penalties in excess of those provided for by law, (f) it imposes on employers obligations inconsistent with those imposed by the Occupational Safety and Health Act of 1970, (g) it is arbitrary, capricious and unreasonable and (h) it is not supported by substantial evidence; 7) the Order violates employers' rights to due process of law by creating an irrebuttable presumption that all physical requirements for employment which result in the rejection of any applicant constitute a violation of the Act and 8) the Act impermissibly delegates legislative power to the Executive in violation of Article I, § 1 of the Constitution. The complaint seeks various forms of declaratory and injunctive relief.

Because of the importance of this case, the Court allowed the filing of several amicus briefs. The case is now before the Court on cross–motions for summary judgment.

II. THE LAW

Plaintiffs' motion for summary judgment contains three major prongs: 1) 29 U.S.C. § 706(7)(B)(iii)[10] and the related regulations, as construed and applied by the decision and Order of the Assistant Secretary, are unconstitutionally vague; 2) Congress limited the benefits of the Act to those handicapped individuals who encounter substantial difficulty in obtaining employment generally, and did not intend to protect job applicants who are denied a particular job because of a perceived impairment or be-

8. The Association is a Hawaii corporation representing several hundred general contractors, including many federal contractors, in labor relations, safety, personnel administration and other matters. It was an intervenor in this case when the case was proceeding through the administrative process.

9. Plaintiffs contend that the case arises, *inter alia*, under the following federal provisions: 1) the Rehabilitation Act of 1974; 2) Executive Order 11758; 3) Title 41 of the Code of Federal Regulations; 4) the Administrative Procedure Act, 5 U.S.C. §§ 554–557 and §§ 701–706 (1976); 5) Article I, § 1 of the Constitution of the United States; 6) the Fifth Amendment of

the Constitution of the United States; 7) the Occupational Safety and Health Act, 29 U.S.C. § 651 *et seq.* (1976); and 8) the National Labor Relations Act, 29 U.S.C. § 185 (1976).

10. 29 U.S.C. § 706(7)(B) reads in pertinent part:
[T]he term "handicapped individual" means . . . any person who (i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) *is regarded as having such an impairment.*
(emphasis added).

cause of the risk of future injury and 3) the defendants' imposition of burdens of proof on contractors to establish "reasonable reliance on valid expert opinion that there is imminent risk of serious injury" or "current inability to perform the tasks of the job" (a) conflicts with applicable regulations, (b) is inconsistent with federal statutory policy to promote worker safety and to encourage preventive medicine and (c) impinges upon the employer's right to due process of law. Defendants ask the Court to uphold the decision of the Assistant Secretary.

A. *The definition of "impairment" and "regarded as having an impairment"*

Plaintiffs argue that the definition of "handicapped individual" contained in the Act and the regulations is unconstitutionally vague. They also argue that since the meaning of the Act and the regulations was impossible to determine in 1976, at the time the decision not to hire Mr. Crosby was made, it would be an unconstitutional deprivation of due process to, in effect, retroactively sanction Black for not knowing what the Department of Labor and the courts were going to say the statute meant in 1979. The Court rejects plaintiffs' contentions.

29 U.S.C. § 706(7) defines a handicapped individual as a person who "(i) has a physical or mental impairment which substantially limits one or more of such person's major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment." Both the Administrative Law Judge and the Assistant Secretary, after determining that "impairment" is nowhere defined in the Act or the regulations, defined it as "any condition which weakens, diminishes, restricts, or otherwise damages an individual's health or physical or mental activity." The "is regarded as having an impairment" language was interpreted consistently with Appendix A to 41 C.F.R. § 60-741:

> Is regarded as having such an impairment refers to those individuals who are perceived as having a handicap, whether an impairment exists or not, but who, because of attitudes or for any other reason, are regarded as handicapped by employers, or supervisors who have an effect on the individual securing, retaining or advancing in employment.

Congress amended the statute in 1974, adding the "is regarded as having such an impairment" language. Their intent was to protect people who are denied employment because of an employer's perceptions, whether or not those perceptions are accurate. It is of little solace to a person denied employment to know that the employer's view of his or her condition is erroneous. To such a person the perception of the employer is as important as reality. As was stated in the Senate Report accompanying S. 4194, the bill that in 1974 added the language discussed above:

> [T]he new definition clarifies the intention to include those persons who are discriminated against on the basis of handicap, whether or not they are in fact handicapped, just as Title VI of the Civil Rights Act of 1964 prohibits discrimination on the ground of race, whether or not the person discriminated against is in fact a member of a racial minority. This subsection includes within the protection of sections 503 and 504 those persons who do not in fact have the condition which they are perceived as having as well as those persons whose mental or physical condition does not substantially limit their life activities and who thus are not technically within [the first clause] in the new definition. Members of both of these groups may be subject to discrimination on the basis of their being regarded as handicapped.

S.Rep. No. 93–1297, 93rd Cong., 2d. Sess., reprinted in [1974] U.S. Code Cong. & Admin. News, pp. at 6389–90.

While the definition of impairment adopted by the Administrative Law Judge and the Assistant Secretary (taken from Webster's Third International Dictionary, unabridged, 1967) is broad, that does not mean that it is either improper or unconstitutionally vague. The Court's examination of the Act and the legislative history con-

vinces the Court that Congress wanted the statute to have broad coverage and effect.

In § 301 of the White House Conference on Handicapped Individuals Act (the Act adding the amendments discussed above), Act of December 7, 1974, Pub.L. No. 93–516, 88 Stat. 1631–34 (codified at 29 U.S.C. § 701 note), it was stated:

The Congress finds that:

.    .    .    .    .

(2) the benefits and fundamental rights of this society are often denied those individuals with mental and physical handicaps;

(3) there are seven million children and at least twenty–eight million adults with mental or physical handicaps;

(4) it is of critical importance to this Nation that equality of opportunity, equal access to all aspects of society and equal rights guaranteed by the Constitution of the United States be provided to all individuals with handicaps;

.    .    .    .    .

(7) all levels of Government must necessarily share responsibility for developing opportunities for individuals with handicaps.    .    .    .

The Court believes that Congress wanted those individuals who either had or were perceived as having physical or mental conditions that disqualified them from employment to be considered as either impaired or regarded as impaired.

■ Given the legislative history of the Act, persons of common intelligence should have had fair warning that the term impairment meant "any condition which weakens, diminishes, restricts, or otherwise damages an individual's health or physical or mental activity." That is a broad, but entirely logical way of viewing the meaning of the term. And the phrase "is regarded as having an impairment" is almost self-explanatory given the meaning of impairment.

The Court sees no basis for the plaintiffs' contention that all impairments must be defined by reference to the American Medical Association Guides to the Evaluation of

Permanent Impairment. Words are not precise symbols and statutory definitions are often unable to precisely define and cover all possible situations. Congress was not required to spell out in detail every possible condition or abnormality that could constitute an impairment. It is clear that Congress was trying to protect a large number of people in a broad range of situations. In *Southeastern Community College v. Davis*, 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), the Supreme Court, after setting out the definition of handicapped individual, noted:

This definition comports with our understanding of § 504. A person who has a record of, or is regarded as having, an impairment may at present have no actual incapacity at all. Such a person would be exactly the kind of individual who could be "otherwise qualified" to participate in covered programs. And a person who suffers from a limiting physical or mental impairment still may possess other abilities that permit him to meet the requirements of various programs. Thus, it is clear that Congress included among the class of "handicapped" persons covered by § 504 a range of individuals who could be "otherwise qualified."

442 U.S. at 405–06 n.6, 99 S.Ct. at 2367. Congress was not required to define impairment any more precisely than it did, and the definition adopted by both the Assistant Secretary and the Administrative Law Judge is neither unconstitutionally vague nor otherwise improper.

Even if in some difficult cases the definition in the Act could be said not to furnish fair warning of its meaning, the Court believes Black had to have had fair warning that Mr. Crosby would be considered impaired or regarded as impaired. Black discovered what it considered a physical abnormality in Mr. Crosby, and it determined that that abnormality disqualified Mr. Crosby absolutely from the job of apprentice carpenter. Black should not have been misled as to the meaning of impairment in relation to Mr. Crosby.

B. *Definition of "substantially limited" and "substantial handicap to employment".*

As noted, 29 U.S.C. § 706(7) partially defines a handicapped individual as one who "has a physical or mental disability which for such individual constitutes or results in a substantial handicap to employment . . . ." That section also provides that a handicapped individual is one who "has a physical or mental impairment which substantially limits one or more of such person's major life activities . . . ." 41 C.F.R. § 60–741.2 provides that "a handicapped individual is 'substantially limited' if he or she is likely to experience difficulty in securing, retaining or advancing in employment because of a handicap." The Administrative Law Judge determined that in order for plaintiff to prove that he was substantially limited and thus covered by the Act, he had to show that the impairment "impeded activities relevant to many or most jobs." The Assistant Secretary reversed the Administrative Law Judge on this point and found that an individual is substantially limited if "the impairment is a current bar to the employment of one's choice with a federal contractor which the individual is currently capable of performing." He found that the only impaired individuals not protected by the Act are those who are not capable of fulfilling a contractor's valid job requirements, and those whose impairment did not serve as the basis for the discrimination.

■ The Court believes that the Assistant Secretary's interpretation of the Act and the regulations is overbroad. He includes within the coverage of the Act any individual who is capable of performing a particular job, and is rejected for that particular job because of a real or perceived physical or mental impairment. Thus, for example, a worker who was offered a particular job by a company at all of its plants but one, but was denied employment at that plant because of the presence of plant matter to which the employee was allergic, would be covered by the Act. An individual with acrophobia who was offered 10 deputy assistant accountant jobs with a particular company, but was disqualified from one job because it was on the 37th floor, would be covered by the Act. An individual with some type of hearing sensitivity who was denied employment at a location with very loud noise, but was offered positions at other locations, would be covered by the Act. The Court does not believe this was the result intended by Congress. If it were, Congress would not have used the terms *substantial* handicap or *substantially* limits—they would have said "any handicap to employment" or "in any way limits one or more of such person's major life activities." The Assistant Secretary's definition ignores the word substantial. Such a definition contravenes the statutory language and is therefore invalid.

■ However, the Court believes that the definition adopted by the Administrative Law Judge is also invalid. He found that in order to be a "qualified handicapped individual," an individual would have to have an impairment "likely to affect his employability *generally*." The Court believes that this type of definition drastically reduces the coverage of the Act, and undercuts the purposes for which the Act was intended. A person, for example, who has obtained a graduate degree in chemistry, and is then turned down for a chemist's job because of an impairment, is not likely to be heartened by the news that he can still be a streetcar conductor, an attorney or a forest ranger. A person who is disqualified from employment in his chosen field has a substantial handicap to employment, and is substantially limited in one of his major life activities. The definitions contained in the Act are personal and must be evaluated by looking at the particular individual. A handicapped individual is one who "has a physical or mental disability *which for such individual* constitutes or results in a substantial handicap to employment . . ." (emphasis added). It is the impaired individual that must be examined, and not just the impairment in the abstract.

The Administrative Law Judge was concerned that focusing on particular jobs or

particular fields rather than on employability in general would lead to anomalous results.

> . . . To further illustrate: a person may have as his life's dream employment as a running back with the Dallas Cowboys. He may be denied this employment solely on the basis of his inability to run 100-yards in 10 seconds or less. This person would then have an "impairment" (condition lessening physical ability) which actually prevented his obtaining particular, desired employment. Yet this person would not be considered "handicapped" within the meaning of the statutory definition since this particular impairment is not *likely* to impact adversely on his employability (since few jobs require this particular talent). The same point could be illustrated by a concert pianist with too-short fingers, or a 5′5″ basketball star. These individuals have conditions which may actually affect their ability to obtain a particular job. But they are not "handicapped" within the meaning of the statutory definition because their respective impairments are not *likely* to affect their employability *generally*, measured against the full spectrum of possible employments.

Administrative Law Judge's Decision, at 12. The Judge's concerns are misplaced. It is true that the individuals he discusses would not be protected by the Act, but the reason is not because their impairment did not substantially limit employability. The individuals he discusses are not "capable of performing a particular job" and hence are not "qualified handicapped individuals" within the meaning of 60 C.F.R. § 60–741.2. An individual who is 5′5″ is not capable of performing the job of center on the New York Knicks. An individual with extremely short fingers is not capable of performing the job of concert pianist. An individual who runs the 100 in 27 seconds is not capable of performing the job as running back for the Dallas Cowboys. Thus, what appears to be a major rationale for the definition adopted by the Administrative Law Judge disappears.

■ The Court believes that the real focus must be on the individual job seeker, and not solely on the impairment or the perceived impairment. This necessitates a case–by–case determination of whether the impairment or perceived impairment of a rejected, qualified job seeker, constitutes, for that individual, a substantial handicap to employment. Employers such as Black may argue that such an individualized, case–by–case inquiry places them in a precarious position—they do not know in advance who is covered by the Act. However, before they come to that precarious position, they must already be dealing with a person who has (or is perceived as having) a physical or mental impairment, who is capable of performing a particular job and who is rejected for that job because of the impairment. These facts alone should put federal contractors on notice that they may be dealing with a person covered by the Act.

Factors that are important in the case–by–case determination are the number and types of jobs from which the impaired individual is disqualified. And the focus cannot be on simply the job criteria or qualifications used by the individual employer; those criteria or qualifications must be assumed to be in use generally. The reason for this is that an employer with some aberrational type of job qualification (people with straight hair are inferior, and thus I require all job applicants to have curly hair) that screens out impaired individuals who are capable of performing a particular job, should not be able to say: "No one else has this job requirement, so the impairment does not constitute a substantial handicap to employment, and the applicant is not a qualified handicapped individual." If such an approach were allowable, an employer discriminating against a qualified handicapped individual would be rewarded if his reason for rejecting the applicant were ridiculous enough. In evaluating whether there is a substantial handicap to employment, it must be assumed that all employers offering the same job or similar jobs would use the same requirement or screening process.

It might seem on the surface that such a view would lead to the conclusion that if the criteria of the rejecting employer were generalized to all employers, then all employers would have to be viewed as if they would reject the applicant. Such is not the case, however. For as discussed earlier, the reason an employer rejects an individual may have more to do with a particular location than a particular job. If that is the case, then for many employers the criteria used by the rejecting employer would be inapplicable.[11] The number of employers in the relevant area (discussed *infra*) that the criteria are applicable to would have to be determined.

Once it is determined how many employers would be affected by the criteria, it must be determined what types of jobs the rejection would apply to. And such a determination must be made objectively. It is not enough, for example, for an employer to say: "Well we would have hired him for any other position, but unfortunately this was the only position we had to offer."[12] If a person in a wheelchair were rejected because a job required moving around in tight spaces, all jobs with that type of requirement would be considered as those for which the applicant was disqualified. The required determination is not difficult in this case. The rejection and the criteria would apply to all jobs that required heavy lifting.

Next, it must be determined to what geographical area the applicant has reasonable access. It is irrelevant that a similar job could be obtained in Kansas City if the applicant lives in San Diego. This geographical area is relevant in order to determine if there are other employers who could offer the applicant the same or a similar job, and if so how many. For example, take the case discussed earlier, of an individual with acrophobia who is rejected for a job on the 37th floor. If the rejecting employer were the only one in the area offering the position, that would constitute more of a handicap to employment than if there were 100 other employers in the area offering the same position, all with first floor offices.[13]

Finally, the individual himself must be considered. His own job expectations and training must be taken into account. The Court is left with the question of, considering the entire spectrum of available jobs, how broad must the disqualification be in order to even possibly qualify the individual as having a substantial handicap to employment. The Court believes the solution is closer to that arrived at by the Assistant Secretary than that arrived at by the Administrative Law Judge. If an individual were disqualified from the same or similar jobs offered by employers throughout the area to which he had reasonable access, then his impairment or perceived impairment would have to be considered as resulting in a substantial handicap to employment. However, what is to be considered a similar job must be made on a case–by–case basis, and may differ among individuals with similar impairments, depending on their training, education, etc.

Certainly, if an applicant were disqualified from an entire field, there would be a substantial handicap to employment. But, questions as to subfields and the like must

---

**11.** There might be fact questions involved if an employer claimed a rejection was based on a particular location. The rejected applicant could contend that the rejection, although phrased in terms of a particular location, really was an across the–board rejection, applicable to the job itself and not the location. In many discrimination cases, however, the motive for a job or a housing rejection is a hotly contested issue.

**12.** If the employer actually does offer other jobs to the applicant, there need be no hypothesizing.

**13.** In evaluating the number of employers offering the same or a similar job, who are not affected by the criteria, an important consideration could be the salary and other benefits offered. If, for example, employers affected by the criteria offered average salaries of $20,000, and the unaffected employers offered average salaries of $7,500, this could be a relevant factor in determining whether there was a substantial handicap to employment.

be answered on a case–by–case basis, after examining all the factors discussed above.

Predicting whether the Act provides coverage in certain difficult or close cases may be hard for an employer. Yet, the Court believes that Congress intended the coverage of the Act to be broad in scope and intended that questions as to that coverage be answered on a case–by–case basis. Both of these intentions would be defeated if the coverage of the Act were reduced because of narrow definitions of "substantially limits" and "substantial handicap to employment."

### C. *Applicability of these definitions to this case.*

There is no doubt that Mr. Crosby either had an impairment or was regarded as having an impairment. The back problem that Black perceived in Mr. Crosby was a condition that "weakens, diminishes, restricts, or otherwise damages an individual's health or physical or mental activity." Black's perception was that the back problem weakened, diminished *and* restricted Mr. Crosby's physical activity. Black found that Mr. Crosby was unsuited for jobs involving heavy labor. Thus, he was clearly impaired or regarded as impaired.

Mr. Crosby's impairment constituted, for him, a substantial handicap to employment. Black's rejection was related solely to Mr. Crosby's physical condition. He was disqualified from all Black's apprentice carpenter positions because of the heavy lifting involved. Had all firms offering similar positions involving heavy lifting used the same criteria as Black, Mr. Crosby would have been disqualified from all such jobs. The apprentice program required 8,000 hours in the field, and at the time of the incident Mr. Crosby had accumulated over 3,600 hours. There is no dispute that in order for him to have completed the 8,000 hours, Mr. Crosby would have had to have obtained jobs similar to the one he applied

for with Black, involving heavy lifting. If all firms offering positions similar to the one offered by Black had used the same criteria as Black, Mr. Crosby would have had great difficulty completing the apprentice program and becoming a journeyman carpenter. The task might have been impossible, but in any case a large roadblock was placed in Mr. Crosby's path. He was substantially limited in his goal of becoming a journeyman.

The Court noted earlier that there might be cases where it is difficult to decide if disqualification from a particular job constitutes a substantial handicap to employment, especially if similar positions or similar fields remain open. However, being disqualified from becoming a journeyman carpenter (or having great difficulty in obtaining such a position) is not such a case. There has been no showing that similar positions would have been available to Mr. Crosby had all firms used Black's criteria, and, in fact, the Court doubts that there are any such positions available in Hawaii.[14]

Black contends that the definition of substantially impaired that was adopted by the Assistant Secretary is unconstitutionally vague.[15] Yet, as noted above, before the "substantially limited" question even comes up, it must first be determined that the applicant is impaired (or regarded as impaired) and capable of performing the job. It is not unconstitutional to tell employers that if such an applicant is rejected because of his impairment, they should be on notice that he could be protected by the Act. And, men of common intelligence would not be shocked to find out that a person is substantially impaired in finding employment if he is disqualified from pursuing the profession of his choice. That is certainly a reasonable interpretation. The Court believes that the definition and method of determination it has adopted is in line with the intent of Congress. Neither the Act nor the regulations are unconstitutionally vague.

14. That is, positions that lead to journeyman carpenter (or similar) status and yet do not involve heavy lifting, twisting and frequent bending.

15. Black would no doubt make the same argument about this Court's definition.

That the definition of the Assistant Secretary has been rejected does not require that this case be remanded. The result he arrived at was the same result this Court arrived at, and, in addition, the factors this Court believed were not covered by the Assistant Secretary's definition are not relevant in this case. The criteria Black used were not related to a particular job location, but were related to the job itself. The position for which Mr. Crosby was disqualified was not very similar to a position he could have obtained had Black's criteria been in general use.

Black also contends that Congress did not intend to protect job applicants denied employment based on risk of future injury. The Court believes that this statement is irrelevant in this case. Mr. Crosby was denied employment because of either an impairment he had or an impairment Black believed he had.

Black also contends that it is unfair and unconstitutional to, in effect, retroactively sanction it for conduct it could not possibly have known was proscribed when it rejected Mr. Crosby. It is true that defendants have, at times, sent out conflicting signals as to the meaning of the Act. It is also true that in some close cases interpretation of the Act may be difficult. However, the Court does not believe that this is a close case. As noted above, the Court believes that Black was or should have been on notice at the time it rejected Mr. Crosby that Mr. Crosby was a handicapped individual within the meaning of the Act and the regulations.

The Court finds from the uncontradicted evidence that Mr. Crosby was capable of performing the job of apprentice carpenter at the time he was rejected. This is the only relevant inquiry in determining whether a rejected applicant is a qualified handicapped individual.[16] Non–imminent risk of future injury may possibly be a reason for rejecting an applicant, but it does not make an otherwise capable person incapable.

Thus, the Court finds that Mr. Crosby was a qualified handicapped individual as that term is used in § 503 of the Act, 29 U.S.C. § 793 (Supp. III 1979), and as that term is defined in other sections of the Act and the regulations.

D. *Propriety of rejecting Mr. Crosby because of risk of future injury and increased insurance or workers' compensation costs.*

41 C.F.R. § 60–741.6(c) provides in pertinent part:

(1) The contractor shall provide in its affirmative action program, and shall adhere to, a schedule for the review of all physical or mental job qualification requirements to insure that, to the extent qualification requirements tend to screen out qualified handicapped individuals, they are job related and are consistent with business necessity and the safe performance of the job.

(2) Whenever a contractor applies physical or mental job qualification requirements in the selection of applicants or employees for employment or other change in employment status such as promotion, demotion or training, to the extent that qualification requirements tend to screen out qualified handicapped individuals, the requirements shall be related to the specific job or jobs for which the individual is being considered and shall be consistent with business necessity and the safe performance of the job. The contractor shall have the burden to demonstrate that it has complied with the requirements of this paragraph.

The Court has determined that in this case Mr. Crosby was a qualified handicapped individual. It is clear then, that Black's job requirement relating to Mr. Crosby's back condition was one that tended to screen out qualified handicapped individuals. Thus, Black has the burden of showing that the requirement is related to the job for which Mr. Crosby was rejected, and that the requirement is consistent with business necessity and the safe performance of the job.

16. In some cases the risk of injury may be so immediate as to prevent an individual from being considered presently capable of performing a particular job. That is not this case.

The Assistant Secretary found that Black's requirement of a healthy back "for the position of apprentice carpenter bore the needed relation to the job and constituted a valid job performance requirement." However, he further found that Black had "the burden of establishing that the condition disclosed by the physical examination and relied on by [Black] to disqualify Mr. Crosby for employment evaluated Mr. Crosby's current capacity to perform the work of an apprentice carpenter." He determined that at best Black had shown that Mr. Crosby's condition had a potential for future significance, and was not related to Mr. Crosby's current capacity to perform. He also held that possible cost increases in insurance or workers' compensation costs were irrelevant. He thus held that Black had violated the Act and regulations by using invalid job qualification requirements.

▮▮▮ The decision of the Assistant Secretary can be read as holding that risk of future injury because of a physical or mental condition can never be the basis for rejecting a qualified handicapped individual, irrespective of the likelihood of injury, the seriousness of the possible injury or the imminence of the injury. Such a holding is clearly contrary to law. If, for example, it was determined that if a particular person were given a particular job, he would have a 90% chance of suffering a heart attack within one month, that clearly would be a valid reason for denying that individual the job, notwithstanding his status as a qualified handicapped individual.[17] A job requirement that screened out such an individual would be consistent both with business necessity and the safe performance of the job. Yet, it could be argued that the individual had a current capacity to perform the job, and thus was a qualified handicapped individual.

The Court has no doubt that in some cases a job requirement that screens out qualified handicapped individuals on the basis of possible future injury, could be both

consistent with business necessity and the safe performance of the job. However, at this stage in the case the Court is not prepared to formulate a legal standard. That is because the Court, before formulating such a standard and applying it to the facts of this case, would like to feel reasonably well-informed as to 1) the significance of Mr. Crosby's back condition and 2) the nature of the medical evidence presented in the administrative proceedings.

At this point, there is a great deal of controversy concerning both the significance of Mr. Crosby's condition and the nature of the evidence presented in the administrative proceedings. The Court readily admits it has had difficulty sifting through the medical evidence contained in the administrative record and summarized in the briefs of the parties. The Court believes that it may be necessary to appoint an expert to study the matter and report to the Court. However, before doing so, the Court wishes to consult with the parties. Thus, at the present time, all motions for summary judgment relating to the job requirement and the medical evidence are DENIED.

The Court feels that all other motions for summary judgment are either not ripe for decision at this time, or need to be further briefed after a conference with the Court. Thus they are DENIED. Partial summary judgment is granted to defendants to the effect that 1) the definition of "qualified handicapped individual" contained in the Act and regulations is constitutional, and 2) when Black rejected Mr. Crosby for the job of apprentice carpenter, it was rejecting a "qualified handicapped individual" within the meaning of the Act and the regulations.

The Court requests the parties to set forth succinctly in writing within 30 days the issues they believe still remain to be decided. A pretrial conference will be held thereafter to determine the future course of this litigation.

---

**17.** It might be that such a condition would prevent the individual from being capable of performing the job and thus would remove him from the category of qualified handicapped individual.