Philip BENTIVEGNA, Petitioner,

v.

UNITED STATES DEPARTMENT OF LABOR, Respondent,

and

City of Los Angeles, Real Party in Interest.

No. 81–7651.

United States Court of Appeals, Ninth Circuit.

Argued and Submitted July 6, 1982.

Decided Dec. 13, 1982.

David Pettit, Venice, Cal., for petitioner.

James A. Henry, Dept. of Labor, Washington, D.C., argued, for respondent; Joanne Tierstein, U.S. Dept. of Labor, Washington, D.C., on brief.

Before ANDERSON, FERGUSON, and NELSON, Circuit Judges.

NELSON, Circuit Judge:

We review the decision of the Secretary of the Department of Labor for the United States declining to award back pay to petitioner, Philip Bentivegna. For the reasons set forth below, we reverse.

## I. FACTS AND PROCEDURAL CONTEXT

The City of Los Angeles (City) hired Bentivegna as a "building repairer" in late August, 1977, through the Comprehensive Employment and Training Act (CETA) program. 29 U.S.C. §§ 801–999 (1976 & Supp. IV 1980). Bentivegna had indicated on an application form that he had diabetes mellitus. As a condition of employment, applicants were required to pass a physical examination. Applicants with diabetes were required to demonstrate "control," meaning blood sugar test results consistently below a certain level. At Bentivegna's physical examination, one test yielded a urine glucose reading of "4 +," which the City's physicians believed demonstrated, or at least raised a significant possibility of, lack of control. Consequently, Bentivegna was terminated from his position in early September.

Bentivegna petitioned the City Medical Review Board for review of his termination.

After this petition was denied, Bentivegna took his case to the Los Angeles Civil Service Commission. At its first hearing on the case, held December 2, 1977, Bentivegna introduced two letters from his treating physicians. One reported a "6 hour blood sugar" of 190, and concluded, "He is now able to work." The other letter stated in its entirety: "Phillip [sic] Bentivegna is a Diabetic, well controlled, and entirely capable of working." Bentivegna also submitted a September 10 laboratory report showing a fasting blood sugar of 226. The City's doctor testified at that hearing that "All evidence that's been submitted up to now shows [Bentivegna]'s not in control." That doctor later defined proof of control as a "series of blood sugars over the course of ... three or four months close to the recommended 150 ...." The Commission deferred review to allow Bentivegna's doctors to clarify the basis for their conclusions.

Despite Bentivegna's efforts, the only further information forthcoming from his doctors was a note stating that "Mr. Philip Bentivegna had a blood sugar of 122 on 11/22/77." At the second hearing, held February 10, 1978, Bentivegna presented this note and a medical opinion letter from an expert stating that: (1) sugar levels less than 120, as control is sometimes defined, may not be the most desirable levels for diabetics; (2) most diabetics have levels between 120 and 175, and are considered "reasonably well controlled;" and (3) "[b]lood sugars less than 250–300 usually cause *no detectable disability* or symptoms." (Emphasis in original.) After reviewing the test results mentioned above, the letter concluded: "The long-term dangers to Mr. Bentivegna with sugars at that level, as with all diabetics, are unclear, the short-term dangers at those levels are minimal."

The Commission denied Bentivegna's appeal without prejudice, one of the Commissioners saying that Bentivegna "can come back within three months to show a controlled situation."[1] The City rehired Benti-

1. Although the statement that Bentivegna can apply for another job for which he is qualified might be taken to mean that his diabetic condition only disqualified him for jobs involving

vegna January 2, 1979, for another construction job, "Maintenance Construction Helper," apparently without requiring proof of control.

After pursuing various courses of relief, Bentivegna filed a complaint with the Department of Labor. He claims that his termination violated section 504 of the Rehabilitation Act of 1973, which prohibits discrimination against an "otherwise qualified handicapped individual." 29 U.S.C. § 794 (Supp. IV 1980). In April, 1980, the Department of Labor Grant Officer concluded that Bentivegna's termination violated CETA regulations and the Rehabilitation Act, ordering the City to pay petitioner lost wages plus interest for the preceding 15 months. A hearing was conducted before the Administrative Law Judge (ALJ) at the City's request.

The ALJ issued a decision reversing the Grant Officer which became the final decision of the Secretary of Labor. *See* 20 C.F.R. § 676.91(f) (1982). Bentivegna brings this appeal.

## II. DISCUSSION

Section 504 of the Rehabilitation Act of 1973 (the Act) provides:

No otherwise qualified handicapped individual ... shall, solely by reason of his handicap, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance ....

29 U.S.C. § 794 (Supp. IV 1980).

It is not disputed that: (1) Bentivegna is a "handicapped person" under the Act, *see* 29 U.S.C. § 706(7) (Supp. IV 1980); (2) he is "otherwise qualified" for the job in question; (3) the job is part of a federally funded program. *See Doe v. New York University,* 666 F.2d 761, 774 (2d Cir.1981). This case turns on whether the Secretary of Labor properly found that the City's diabe-

tes standard was nondiscriminatory and that the standard was properly applied in the decision to terminate Bentivegna. The standard of review on this appeal is that "the findings of fact by the Secretary, if supported by substantial evidence, shall be conclusive ...." 29 U.S.C. § 817(b) (Supp. IV 1980).

### A. Legal Standards for Job Qualifications

The Supreme Court has held that "[a]n otherwise qualified handicapped person is one who is able to meet all of a program's requirements in spite of his handicap." *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980, 988 (1979); *see id.* at 407 n.7, 99 S.Ct. at 2367 n.7, 16 L.Ed.2d at 989, n.7. This cannot mean that the City can discriminate by establishing restrictive "program requirements" where it could not so discriminate in making individual employment decisions. The Rehabilitation Act, taken as a whole, mandates significant accommodation for the capabilities and conditions of the handicapped. Blanket requirements must therefore be subject to the same rigorous scrutiny as any individual decision denying employment to a handicapped person.

The proper standard for this inquiry is set forth in the Secretary's regulation on "Job Qualifications" interpreting section 504. 29 C.F.R. § 32.14 (1982). It provides that job qualifications "which would tend to exclude handicapped individuals because of their handicap ... shall be related to the specific job or jobs for which the individual is being considered and shall be consistent with business necessity and safe performance." *Id.* § 32.14(b). The importance of preserving job opportunities for the handicapped sets a high standard for the effectiveness of job qualifications that adversely affect the handicapped. The regulation makes consistency with business necessity an independent requirement, and the courts must be

risks of injury, such as construction-related jobs, the record indicates that the City's doctors recommended Bentivegna's termination based on the Medical Board's general standard requiring controlled conditions for the employ-

ment of diabetics. Insofar as a city policy is discernible, it is that of the Medical Board: as one of the Civil Service Commissioners observed, "[I]t's kind of hard to vote against the Medical Department ...."

wary that business necessity is not confused with mere expediency. If a job qualification is to be permitted to exclude handicapped individuals, it must be directly connected with, and must substantially promote, "business necessity and safe performance." The City had the burden of demonstrating that its job qualifications met this standard. *Id.; see E. E. Black, Ltd. v. Marshall,* 497 F.Supp. 1088, 1103 (D.Haw. 1980). The question for this court, then, is whether there is sufficient evidence in the record to support the Secretary's finding that the City's control requirement as applied to Bentivegna satisfied the standard of 29 C.F.R. § 32.14, as interpreted here.

### B. *The City's Requirement of Controlled Blood Sugar Levels for Diabetics*

The City terminated Bentivegna because his blood sugar levels were not proven to be controlled below certain levels. The Department of Labor justifies the City's requirements with the proposition that "diabetics who are not under good control, i.e., those with high blood sugar levels, are more prone to get serious infections from relatively minor injuries, that they heal less rapidly than others, and they are more likely to have long term health problems causing absenteeism and shorter careers." In applying the substantial evidence test to these contentions, we will first consider the argument relating to possibly increased risks from injury.

#### 1. *The City's first justification—risk of future injury*

The City's doctor, Dr. Hanks, testified before the ALJ that the termination was motivated by "concern for Mr. Bentivegna's personal health and safety as a result of potential injury." Any qualification based on the risk of future injury must be examined with special care if the Rehabilitation Act is not to be circumvented easily, since almost all handicapped persons are at greater risk from work-related injuries.

Dr. Hanks provided the strongest support for the City's position, stating that all diabetics are subject to progressive vascular and neurological problems that can elevate the risks associated with injury. The doctor who testified for Bentivegna agreed that diabetics often do not handle infections as well as nondiabetics. But the City bore the burden of proving that controlling blood sugar levels to the required level contributes cognizably to personal health and safety.[2] Dr. Hanks' testimony is inadequate for this purpose in three ways. First, it makes no comment on whether these problems are more serious in diabetics with higher sugar levels. The two City doctors testified that there is little evidence that diabetics with elevated levels are at more risk than well-controlled diabetics. Second, the testimony provides no reason to believe that Bentivegna will be safer over time if he now manages to lower his blood sugar levels. If, as Dr. Hanks stated, the damage is done for all long-term diabetics, the City's restrictions would be seriously underinclusive. Third, even if we accept the claim that achieving control diminishes risks, the testimony could not establish that the difference between controlled and uncontrolled diabetics was sufficient to make the control requirement "related to the performance of the job and ... consistent with business necessity ...." 29 C.F.R. § 32.14(a) (requiring review of job qualifications).

The most this record provides to support the control requirement is that the City's doctors—like Bentivegna's doctors—prefer better control of blood sugar levels to worse control. Like the psychological theories adduced against an applicant for a psychiatric residency with multiple sclerosis in *Pushkin v. Regents of the University of Colorado,* 658 F.2d 1372, 1391 (10th Cir.1981), the City's evidence provides "weak and inadequate threads" to support a decision having important consequences for a handicapped person. The evidence presented was not sufficient for the Secretary to conclude that

---

**2.** The City does not assert that Bentivegna was a danger to others. Dr. Hanks admitted that diabetics with Bentivegna's blood sugar levels are in no danger of such acute systems as dizziness, tremor, or coma.

the City had carried its burden of demonstrating that its requirement of control complies with the standard adopted above.[3] Therefore, we need not consider whether there was sufficient evidence to find that Bentivegna was indeed out of control, as the City uses that term.

### 2. The City's second justification—long-term health problems

The City properly places little reliance on this basis for the job qualification in question. First, as discussed above, these potential problems do not support a distinction between controlled diabetics and diabetics like Bentivegna. Second, and more important, allowing remote concerns to legitimize discrimination against the handicapped would vitiate the effectiveness of section 504 of the Act. Potentially troublesome health problems will affect a large proportion of the handicapped population. Consistent attendance and an expectation of continuity will be important to any employer. Such considerations cannot provide the basis for discriminatory job qualifications unless they can be connected directly to "business necessity or safe performance of the job."

### CONCLUSION

We find insufficient evidence in the record to support the Secretary's conclusion that the City's requirement of controlled blood sugar levels for diabetics does not discriminate against handicapped individuals in a way that violates section 504 of the Act. Neither the City's allegation of increased risks of injury nor the possibility of long-term health problems is supported by evidence adequate to establish the direct connection between the particular job qualifications applied and the considerations of business necessity and safe performance that the Act requires. The City's control requirement violates section 504 of the Act, and Bentivegna's termination pursuant to that standard was therefore unlawful. The City offers no other reason for Bentivegna's termination.

The Secretary's decision is reversed and the case is remanded to the Department of Labor for determination of the damages the City owes Bentivegna for his unlawful termination.

REVERSED AND REMANDED.

J. BLAINE ANDERSON, Circuit Judge, dissenting:

I dissent because this case is straightforward, calling for a simple application of the standard of review. 29 U.S.C. § 817(b) provides in part, "The findings of fact by the Secretary [of Labor], if supported by substantial evidence, shall be conclusive. . . ." This standard has here been met and I would accordingly affirm the decision of the Secretary denying back pay to Bentivegna.

The Supreme Court in the leading case, *Southeastern Community College v. Davis,* 442 U.S. 397, 99 S.Ct. 2361, 60 L.Ed.2d 980 (1979), discusses the language of § 504 of the Rehabilitation Act of 1973, 29 U.S.C. § 794 (1981). The statute applies to Federal financially assisted programs and is not limited to educational establishments. Though there are differences between *Southeastern* and this case, those differences do not affect the application of the reasoning in *Southeastern* here. The Court granted certiorari "because of the importance of this issue to the many institutions covered by § 504." 442 U.S. at 404, 99 S.Ct. at 2366, 60 L.Ed.2d at 987. In my opinion, the Supreme Court intended to

---

**3.** We do not hold that a non-imminent risk of injury cannot justify rejecting a handicapped individual. *See Doe v. New York University,* 666 F.2d 761 (2d Cir.1981) (overturning preliminary injunction requiring admission of prospective medical student who had exhibited self-destructive behavior); *Kampmeier v. Nyquist,* 553 F.2d 296 (2d Cir.1977) (upholding denial of injunction against exclusion from sports of one-eyed high school students); *E. E. Black, Ltd. v. Marshall,* 497 F.Supp. 1088 (D.Haw.1980) (denying summary judgment of carpenter with back problems). A requirement more directly tied to increased risk of injury, such as the exclusion of diabetics with demonstrated nervous or circulatory problems—something all physicians testifying in this case agreed would markedly increase the risks from injury—might present a different case if applied to applicants for a job that carries elevated risks of injury.

adopt a general rule for application to § 504 suits. We should not be prone to probe for exceptions. Therefore, "institutions" has a broad meaning encompassing an employer. The Court concluded an otherwise qualified person is one who is able to meet all of a program's requirements in spite of his handicap. 442 U.S. at 406, 99 S.Ct. at 2367, 60 L.Ed.2d at 988.

Petitioner established a *prima facie* case under § 504. He demonstrated: 1) he is handicapped, 2) he is qualified for the position sought, 3) he is being rejected solely on the basis of his handicap, and 4) the position exists as a part of a program receiving Federal financial assistance. At that point, the burden shifted to the City to present evidence that petitioner was not qualified since he did not meet the reasonable requirements for the job. Regulations of the Secretary of Labor permit the recipients of Federal funding (the City here) to establish job qualifications and conduct preemployment medical examinations, but to the extent the criteria tend to exclude handicapped individuals, "they are [to be] related to the performance of the job and [be] consistent with business necessity and safe performance." 29 C.F.R. § 32.14(a).

It is clear then § 504 does not restrict the right of recipients of Federal funding to establish job-related criteria for their prospective employees. Hence, once the recipient produces evidence justifying the qualification as being job-related, the petitioner must carry his ultimate burden of persuasion that he is qualified in spite of his handicap.

The Secretary found the City's policy substantially justified and reasonably job-related. There is substantial evidence in the record that Bentivegna's diabetes was not controlled. Evidence demonstrated poorly controlled diabetics were more prone to possible injury and complications than uncontrolled diabetics. The Secretary received testimony and documents on the effects of diabetics and consequences of control. The Secretary could reasonably conclude controlled diabetes was necessary to the job of "building repairer." Because proof of control required testing and observation over a period of three to four months, it was not improper nor unreasonable for the Administrative Law Judge (or the City) to require petitioner to come forward with medical evidence of control. Facts in the peculiar knowledge of one causes the burden of proof to shift to him even if it would not otherwise rest there. *U.S. v. Hayes,* 369 F.2d 671, 676 (9th Cir.1966).

Bentivegna failed completely to produce evidence of control. Such evidence produced in December 1978 from a different doctor has no relevance to Bentivegna's evidence of qualification for the 1977 position from which he was terminated. It is unfortunate that Bentivegna may have been able to establish control, but for the intransigence of his previous doctors.

The record supports the Secretary's conclusion. Evidence established there could be a reasonable difference of opinion among physicians about uncontrolled diabetes and Bentivegna's ability to work safely as a carpenter. Decision and Order, July 6, 1981, p. 2.[1] Substantial evidence is present supporting the conclusion that the City's

---

1. The record supports, and the administrative law judge found as follows:

"At the hearing the City's physicians testified that whatever little information they were able to obtain from Bentivegna's private doctors confirmed that his diabetes was not under good control, and that Kramer's note to the effect that Bentivegna was under control was simply erroneous. The Board asked Drs. Kramer and Scholnick by letter to clarify why they thought Bentivegna was under good control. Kramer and Scholnick advised Bentivegna's attorney that they were too busy to explain their reasoning or to

write letters on Bentivegna's behalf, but did send a note showing that on November 22, 1977, Bentivegna's blood sugar level was 122. Plaintiff's counsel then obtained a written opinion letter from a Dr. Greenfield, an internist who also testified in this trial. Greenfield feels that uncontrolled diabetes and high blood sugar levels bode ill for long term future health of a diabetic and increase his risk of vascular and related diseases. However, he feels that Bentivegna could work safely as a carpenter even with poorly controlled diabetes, although he concedes that reasonable physicians could differ on this point."

"requirements of good control of diabetes as a precondition for municipal employment in the construction trades is reasonable" as the Secretary found. Decision and Order, p. 3.

Bentivegna did receive individual evaluation pursuant to § 504, and the policy and practice of the City.[2] Applicants who displayed diabetes mellitus were "individually evaluated by the examining physician" to determine eligibility and limitations. (Record attached to November 8, 1977 recommendation about the appeal of Philip Bentivegna, Memorandum from the General Manager of the Medical Review Board to the Board of Civil Service Commissioners, p. 6). The record supports the Secretary's conclusion that Bentivegna was individually assessed:

> "The City gave him a medical examination, had his medical data evaluated at least twice by a board of physicians, gave him two sympathetic hearings before the Civil Service Commission where he was represented by counsel and presented evidence, and even wrote to his physicians more than once. It is hard to imagine how much more personal a large municipality could be...."

Decision and Order, p. 5.

In light of the support for the Secretary's conclusion that there was no discrimination of any kind, the denial of the back pay remedy is entirely appropriate, and I would affirm the decision of the Secretary of Labor.

---

**2.** Again, the record supports, and the administrative law judge found as follows:

> "In view of the foregoing, it is clear to me that the City of Los Angeles had a perfectly legitimate employment related reason for insisting that diabetics it employed, especially in the construction trades where injuries are fairly common, have their diabetes under good control. There was no blanket disqualification on account of some handicap or disability over which the employee has no control, but rather a policy to refuse employment until an applicant showed good control of his condition, something which was within the power of most applicants to do. Such a policy does not appear to be invidious or discriminatory."