Henry **SERRAPICA**, Plaintiff,

v.

**CITY OF NEW YORK**, Defendant.

No. 88 Civ. 2040 (KC).

United States District Court,
S.D. New York.

March 14, 1989.

David Lira, Garden City, N.Y., for plaintiff.

Brian Sokoloff, Corp. Counsel of the City of New York, New York City, for defendant.

## OPINION AND ORDER

CONBOY, District Judge:

Plaintiff has brought this action under the Rehabilitation Act of 1973, 29 U.S.C. § 794, and New York State Executive Law, § 296, in connection with his medical disqualification by the City of New York ("the City") for appointment as a sanitation worker. The basis for his disqualification was, according to the City, the medical condition of uncontrolled diabetes mellitus. The plaintiff asserts that his condition, whether or not controlled, does not prevent him from reasonably performing the duties of sanitation worker, for which he is otherwise qualified. A trial on this matter was held without a jury on January 24, 25 and 26, 1989.

## FACTUAL BACKGROUND & RELEVANT TESTIMONY

The parties agree that in 1983, after making application for employment, the plaintiff took and passed a required written examination prepared and administrated by the defendant for the position of Sanitation Worker. In 1985, the plaintiff took and passed a physical test required of all candidates for that position. On June 12, 1986, as part of a medical examination required of all candidates for the position, the plaintiff was required to complete a questionnaire. On this questionnaire, the plaintiff

**1.** "Tr." refers to the transcript of the trial proceedings.

**2.** Webster's defines "hypoglycemia" as an abnormal decrease of sugar in the blood. Webster's

disclosed to the defendant that he has diabetes and is required to take insulin. On January 27, 1987, as part of a medical examination, the plaintiff was required to complete another questionnaire. On this questionnaire, the plaintiff again disclosed to the defendant that he has diabetes, and is required to take insulin. During the course of the medical examination on the same date, a medical technician for the SmithKline Bio–Science Laboratories, a medical testing laboratory with a laboratory testing contract with the Department of Sanitation, drew blood from the plaintiff in order to conduct a blood sugar test. On February 5, 1987, the Department of Sanitation found the plaintiff to be medically not qualified. The plaintiff was initially notified of his disqualification by a "Notice of Not Qualified," approved by the Department of Sanitation's Director of Personnel on March 26, 1987. In a subsequent formal "Notice of Personnel Director Action," dated June 5, 1987, issued by the Department of Personnel, the plaintiff was informed that he failed to meet medical requirements for the position of Sanitation Worker. The plaintiff subsequently appealed the decision of the City Personnel Director to the Civil Service Commission, which affirmed the Personnel Director by notice dated April 12, 1988. First Amended Pre-trial Order at 2–4.

The plaintiff called three witnesses at trial: Henry Serrapica, the plaintiff; Borisse Paulin, M.D., the deputy medical director of the New York City Department of Sanitation (the "Department"); and Alan P. Braun, M.D. a specialist in diabetes who examined plaintiff.

The plaintiff testified that he was first diagnosed as having diabetes in 1976, Tr. 2 [1]; that he was hospitalized for the disease in that same year but has not been hospitalized since, Tr. 23; and that when he experiences hypoglycemic [2] reactions he feels shaky, consumes a packet of sugar, and the shakiness stops, Tr. 23–24. He has

Third New International Dictionary 1115 (Unabridged 1986). By contrast, "hyperglycemia" is an excess of sugar in the blood. *Id.* at 1112.

been employed since August, 1988 as a mail carrier in Suffolk County by the Post Office, and routinely carries a 35 to 40 pound mail satchel for five hours a day in all weather. Tr. 24. He has had some hypoglycemic reactions while working, but not while driving his mail jeep. Tr. 25. He insisted that his diabetic condition has had no effect on his ability to perform his duties as a postal worker. Tr. 26. In his previous employment by a messenger company at Kennedy Airport, involving a great deal of driving, lifting and freight handling, plaintiff testified that his diabetes caused him no difficulties. Tr. 29. Concluding his direct examination, plaintiff said that he has had no problems with his extremities, blackouts, numbness or seizures. Tr. 32-33.

On cross-examination, plaintiff said that he had been told by a doctor that his blood sugar reading had gone as high as 345 mg/dl. Tr. 36. He then admitted that it had gone as high as 390 mg/dl. *Id.* When asked how frequently his blood sugar reading is over 200 mg/dl, he answered "not that much." Tr. 36. After saying he didn't remember, Tr. 37, he conceded that on his last visit to a doctor, on July 23, 1988, his blood sugar reading was 260 mg/dl, and that on his previous visit to his doctor, around February 6, 1988, he was told the reading was 250 mg/dl. Tr. 35. He said that at the time he was applying for the sanitation job he saw a doctor three times between January and March, 1987, but couldn't recall what the blood sugar levels were. When confronted with the readings of 290, 250 and 210 mg/dl, for these three visits, he insisted he couldn't remember. Tr. 39. When asked whether he recalled getting a reading of 390 mg/dl, the highest reading in medical records produced to the defendant, a reading given to him by his physician Dr. Eli Ide, on April 3, 1982, plaintiff stated that he didn't remember. Tr. 40. After some hesitation, plaintiff conceded that he ceased consulting his doctor for three years after getting the highest blood sugar reading he had ever received, 390 mg/dl. Tr. 41. He indicated that from time to time he developed boils on his body, and last had such boils in the summer of 1988. Why then, did Dr. Braun notice such boils when he examined plaintiff in December (1988), plaintiff was asked, without satisfactory answer. Tr. 42-43. On the matter of poor control of blood sugar levels and severe overall debilitation due to diabetes, plaintiff testified as follows:

Q. Mr. Serrapica, haven't you been warned by Dr. Ide and by Dr. Braun, that if you stay out of control, if you let your blood sugar go over 200, and you get up close to 400, as sometimes happens, that these things that happen to diabetics will happen to you over the course of time?

A. Yes. As long as you—if you don't stick to your diet, and—and take insulin and keep your blood sugar low, it shouldn't happen.

Q. But if your blood sugar is not kept low, these things that can happen to diabetics and can disable a person and make a person's life miserable, those things can happen to if you don't keep your blood sugar low, can't they?

A. Yes.

Tr. 43-44.

The plaintiff further stated that as of the time of the trial he had not started attending courses for treatment in controlling his diabetes, even though his doctor had recommended he do so. Tr. 59-60.

Dr. Borisse Paulin, deputy medical director of the City's Department of Sanitation testified that upon reviewing plaintiff's medical examination and test results, she concluded that plaintiff could not be hired for the safety title position he was seeking. Tr. 68. The reason was based upon the finding that his diabetes was not well controlled, and that disqualification was required under the prevailing medical disqualification criteria. Tr. 69-70. In substance, plaintiff's blood sugar was not under control. Tr. 71. The Doctor asserted that in her professional opinion good control would constitute a level "anywhere between 80 and 140". Tr. 72. The relevant criteria published by the Advanced Research Resources Organization, utilized by the Department in a physician's manual

for sanitation workers, indicates an acceptable range of between 80 mg/dl and 200 mg/dl. Tr. 72.

Doctor Paulin further explained that the purpose of the medical testing and assessment performed with respect to applicants for the job of sanitation worker is to exclude anyone with a condition that would be a hazard to public safety in the operation of a large or dangerous motor vehicle or piece of equipment, and that the average sanitation worker lifts 17 tons per day. Tr. 76–77. Workers must lift heavy, bulky objects, operate complex and sometimes dangerous equipment, drive in hazardous road conditions and inclement weather and may be exposed to dust, fumes, odors, extreme heat and biting cold. Tr. 81. The Department is responsible for any accident or injury that might happen to a civilian because of some medical problem of one of its employees. *Id.* Blackouts behind the wheel of heavy-duty motorized equipment is a concern. Tr. 82.

Dr. Paulin testified that on his medical questionnaire plaintiff had stated that he had been an insulin dependent diabetic for about ten years. Tr. 83. When examined in 1987, the examining physician noted that the candidate had healed boils on the buttocks, indicating a problem with control of the blood sugar, Tr. 87, and that his postprandial (after meal) blood sugar levels were significantly higher than 183 mg/dl.

The Department's policy does not exclude from employment people with diabetes on insulin. Tr. 90.

What the department wishes to know is that when we put someone with diabetes on insulin behind the wheel of a large vehicle or walking behind a grinding hopper with clashing teeth, that he or she is going to be in reasonable diabetic control, that the sugar is not going to fall too low and the person is not going to faint and fall into the hopper or, at the other end of the spectrum, that the sugar is not going to rage out of control in the upper ranges and the person go into acute diabetic coma while he is on the job, or have increased incidence of infection or disability or vascular disease, so

that we certainly would like to participate with the candidate and his physician in working out some system of mutual benefit for both.

Tr. 90–91.

Dr. Paulin stated that plaintiff had submitted two letters to the Department as part of his application, from his personal physician Dr. Eli Ide, the first dated June, 1986, and the second dated January 29, 1987. In the June, 1986, letter, Dr. Ide asserted that plaintiff's "blood sugar reading for the past years (three years) varied from 315, 260 and to date is 195 and, as a result, he may perform all duties expected of him on his job." Tr. 91. In the January, 1987, letter Dr. Ide stated that "to date his blood sugar count is 195." Tr. 92. These readings would translate into postprandial readings greater than 200 mg/dl. Tr. 93.

Plaintiff's personal physician, Dr. Eli Ide, testified that he had been treating plaintiff since January 15, 1979. Tr. 191. Four months later, plaintiff's blood sugar was 250 mg/dl, Tr. 192, and his visits thereafter were "erratic" and for an interval of approximately three years he didn't visit his physician at all. Tr. 192. On March 2, 1980, his blood sugar reading was 310 mg/dl; on May 17, 1980 it was 270 mg/dl; and on August 2, 1980 it was 260 mg/dl. Tr. 193. For the following seventh month period plaintiff had the consistently high reading of 260, 260 and 260 mg/dl, as disclosed by examinations of his physician. On April 2, 1981, his reading was 330 mg/dl and by June of that year it was still at 330 mg/dl. By February of 1982 it was 350 mg/dl and by April, 1982, it has risen to 390 mg/dl. Tr. 195. It was at this point that plaintiff stopped seeing his physician for three years. Tr. 196. On June 8, 1985 plaintiff visited his physician and his blood sugar was recorded at 195. It was found on a subsequent visit on November 2, 1985 to be 250. Tr. 196–97.

At the request of plaintiff, Dr. Ide sent a letter dated June 30, 1986 to the Department of Sanitation. Defendant's Trial Exhibit O. On this letter, Dr. Ide stated that, Mr. Serrapica "comes in periodically for

blood sugar tests to determine the extent of his diabetes," and in a postscript, that:

Mr. Serrapica's blood sugar readings for the past three years vary from 315 to 206 and to date is 195, and as a result he may perform all duties expected of him on his job.

*See id.*

The Doctor grudgingly conceded when examined by the City's counsel, that he had seen plaintiff only twice in the four years before he wrote this letter. Indeed, the Doctor's records showed, and he admitted, that he had not seen plaintiff between November 2, 1985, and September 20, 1986, even though his letter to the City was dated June 30, 1986. Tr. 200. When asked to explain that as of June 30, 1986, he had taken only two blood sugars in the last four years and yet he cited three blood sugar readings in his letter, he responded "I really don't know." Tr. 202. Furthermore, the Doctor was unable to explain why the blood sugar levels cited in his letter didn't match the two he had most recently recorded in his records. Tr. 202. He finally conceded that when he said in his letter that plaintiff's reading "to date is 195," this information was contradicted by his own records, and he should have written 250 instead of 195. Tr. 203–04. Additionally, he conceded that the three readings he gave the City, 315 mg/dl, 260 mg/dl and 195 mg/dl did not correlate to the three most recent readings he had actually obtained from plaintiff, 390 mg/dl, 195 mg/dl and 250 mg/dl. Id. The Doctor also admitted that his letter to the City had concealed how high the blood sugar readings had actually gone in the case of Henry Serrapica. Tr. 205.

Dr. Ide was examined about a subsequent "to whom it my concern" letter dated January 29, 1987, that he wrote, and which plaintiff later submitted to the City Departments of Personnel and Sanitation. Tr. 208. In this letter, the Doctor certified that "his blood sugar count is 195." In fact, Dr. Ide's own medical records show, and he admitted, that two weeks before the letter was written, and four days after that, the plaintiff was tested at levels of 290 mg/dl and 250 mg/dl respectively.

In a July 14, 1988, letter to the Corporation Counsel, Doctor Ide reported a blood sugar reading of 135 mg/dl for Mr. Serrapica, but did not report that just a few days later subsequent tests showed a blood sugar level of 260 mg/dl. Tr. 211. This is the last reading Dr. Ide has for plaintiff, which was taken six months prior to the trial. The Doctor testified that such a reading requires follow-up treatment, that plaintiff had not visited him during this period, that he is "a very erratic" patient, and that with "a diabetic condition you have to keep on top of it, you can't just let it run away." Tr. 212. Plaintiff has not been in to see his Doctor regularly even though he has been told by Dr. Ide that if he continues in the range of above 250 in his blood readings, there are visual dangers, including "blurring of vision, deterioration," and neurological problems, including neuropathy, circulation problems and artery disease. Tr. 213. Dr. Ide also testified that when he gave the City his opinion that plaintiff was medically qualified to be a sanitation worker, he believed that such work is "not terribly strenuous." Tr. 216.

At the end of his direct examination by the Corporation Counsel, Dr. Ide and the Court had the following colloquy:

THE COURT: If you were told that the typical sanitation worker is called upon to lift approximately 10 tons of refuse a day in New York City, would that change your opinion as to whether it is a strenuous job or not?

THE WITNESS: Yes, I would say so, except in diabetic situations it is very peculiar. First of all, if a man has a job and has an incentive to keep the job, then he will have an incentive to maintain the diet, a proper diet. In other words, if he is not working, then he says, "Oh, well, what's the use, no sense, I won't bother watching my diet." That's one aspect of it.

As far as the diabetic condition is concerned, it is also known that a certain amount of exercise helps burn up some of the excess sugar.

A City personnel official, Betty Figueroa, testified that a consultant recommended that the City liberalize its medical disqualification criteria for applicants with diabetes, to allow appointment of diabetics in good control of their disease through medication and diet, and that the City adopted this recommendation. Tr. 249.

Charles Irwin, director of personnel management for the City Department of Sanitation, testified that all entry level sanitation workers are required to operate heavy duty mechanized equipment, some of which is 30 tons in weight when fully loaded, Tr. 261; that new workers are typically assigned to Manhattan, where the traffic conditions are the most hazardous, Tr. 266; and that a new sanitation worker, after additional training, would more likely be assigned to work on mechanical sweepers, with additional gears and hydraulic systems, which are manned by only one worker. Tr. 268–69. In major snowstorms, all employees are expected to operate snowplows or salt spreaders, in very adverse conditions for sometimes protracted periods of time. Tr. 270–72. Both vehicles are manned by only a single worker. Tr. 273. The marine operations of the Sanitation Department also require the typical worker to deal routinely with dangerous procedures and equipment. Tr. 278.

Plaintiff's expert, Dr. Alan Braun, testified that control is "extremely important" in managing the disease of diabetes, Tr. 111; that for an average diabetic the desirable fasting blood sugar level should be approximately 150–160 mg/dl and one hour after a meal not higher than 200–220 mg/dl; and that a diabetic in minimal (poor) control has higher levels, even over 300 mg/dl on occasion, Tr. 114, and sometimes has ketones (chemical elements associated with blood sugar levels) in his urine Tr. 115. Dr. Braun indicated that "minimal control is a person who does not understand diabetes . . . or is unable to intervene in his own behalf." Tr. 115. With respect to the long term, insidious effects of high blood sugar levels, diabetics in poor control would have significantly higher records of sickness, disabilities and early retirement than diabetics in good control. Tr. 123.

Dr. Braun took a blood sugar test of plaintiff and found it to be 264 mg/dl, three hours after a meal. Tr. 132.

With respect to criteria in the hiring of diabetics, Dr. Braun conceded that New York City is more enlightened in its selection criteria than the regulatory agencies of either the State of New Jersey or the United States Government, which reject diabetics seeking employment in transportation titles, irrespective of whether they are in good control of their disease. Tr. 149. The witness also agreed that if there was evidence over a ten year period in the applicant's prior management of the disease of a lack of vigilance and seriousness of purpose with respect to its control that this would be an appropriate basis for the City to reject the patient's application for appointment. Tr. 152.

On cross-examination, Dr. Braun conceded that at a previous deposition he had stated that, at that time, Mr. Serrapica would not meet Dr. Braun's own standards for employment of an insulin dependent diabetic. Tr. 154–56. The plaintiff was not "in control" when Dr. Braun saw him. Tr. 160. The presence of ketones in his urine indicated Mr. Serrapica was "not in good control." Tr. 161. He had "chronic hyperglycemia," Tr. 164, experienced insulin reactions almost daily, Tr. 168, and such reactions do impair judgment, Tr. 169. On a glycohemoglobin test conducted by Dr. Braun, plaintiff tested at 11.9 percent, and, according to Dr. Braun, 12 percent indicates poor control of the disease. Tr. 171.

Dr. James D. Levy, the City's expert, testified that plaintiff is not a well controlled diabetic, but a poorly controlled diabetic. Tr. 312–13. Operating machinery on a road or highway is a dangerous occupation for persons subject to hypoglycemic episodes. Tr. 313. Elaborating on such episodes, Dr. Levy stated further:

Q. Will Mr. Serrapica be able to readily recognize a hypoglycemic attack when it occurs?

A. There is a lot of misunderstanding about that.

One would say there is a good possibility he would, but depending on the level of control of his diabetes, what you find out as diabetics proceed and they're poorly controlled, their early recognition of hypoglycemia tends to become attenuated. A part of that is because they don't have the same kind of neurologic sensitivities than somebody that has not been diabetic for a long period of time.

What you find out is the body handles hypoglycemia in a very remarkable way. The body is remarkable in itself. They have feedback mechanisms. In a normal individual when the blood sugar drops, the insulin secretion also drops, glucagon is expressed and also epinephrine, and that begins to produce more sugar, so you have a very nicely controlled situation.

In the diabetic, over a period of time what you find out is the autonomic response, epinephrine response is abnormal. They don't begin to compensate. The glucagon and ability to respond to glucagon doesn't happen and what you find out is these people can slip into hypoglycemia and not have the same level of sensitivity they might have had 10 years before that.

So chronically poorly controlled diabetics do not have the same kind of ability to recognize hypoglycemia as others and what you find out is if you watch these individuals, their judgment is impaired, they frequently can carry on for a good period of time and then you will go and you can recognize it, you can see it and when you do something for them, they will say to you they don't remember what happened over the last several minutes.

The other thing you have to remember is these people, untreated, will, in fact, die, and it is estimated that about 7 percent of all deaths due to diabetes in the United States are due to hypoglycemia. This is not something that is everyday easily to recognize and easy to do something about it. It is a problem that needs to be addressed.

How do you address it?

You control the diabetes. Some people are never well controlled in the sense of hypoglycemia. Riddle diabetics are very difficult to control. Some diabetics have to have insulin 4, 5, 6 times a day just to kind of keep them functional, keep them within a reasonable level of function. Most diabetics have to have insulin twice a day, most insulin dependent people. Hypoglycemia is something that shouldn't be accepted as just a variation without some very, very careful attention.

Tr. 313.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

The following constitute the Court's findings of fact and conclusions of law:

1. In 1983, after making application for employment, the plaintiff took and passed a required written test portion of the Civil Service examination prepared and administered by the defendant for the position of Sanitation Worker.

2. The defendant disqualifies job applicants who have a disability which impairs the individual's ability reasonably to perform the duties of the position in which the applicant seeks employment at the time of application or in the foreseeable future.

3. The examination process includes a physical test required of all applicants, and an individualized medical examination of each applicant.

4. The City Personnel Director establishes medical standards for the different agencies. The medical standards applicable to Sanitation Worker Exam No. 1012 were originally promulgated in 1974. A second amended set of medical standards was promulgated October 8, 1986, and a third amended set of medical standards was promulgated August 5, 1987.

5. The revision of these standards was developed in consultation with the Advanced Research Resources Organization, a medical consulting firm located in the Washington, D.C. metropolitan area. In this study, critical tasks for a sanitation worker were reviewed in a job analysis conducted by the consultant, and the im-

pact of various medical conditions on the performance of critical tasks was analyzed by a team of medical experts.

6. The applicable medical standards are applied individually to job applicants. They require the exercise of professional medical judgment in light of each applicant's medical history and the job duties to be assumed.

7. No medical standard is an absolute disqualification. The standards are medical guidelines designed to aid the examining physician in determining whether a candidate can reasonably perform the job duties now or in the foreseeable future.

8. For Standard 3–2, Diabetes Mellitus, the standard disqualifying criteria is:

Target organ damage present, blood sugar frequently irregular (control by diet or insulin acceptable).

9. Testing for acceptable levels of blood sugar is done by a variety of procedures. The applicant's medical history is reviewed. Blood sugar levels may be determined by drawing blood samples. An individual may be serially retested, as plaintiff was, to get an accurate medical profile of his or her condition.

10. According to the Physician's Manual for Sanitation Worker, an individual with diabetes will be "[a]ccept[ed] if documented and controlled with diet and oral hypoglycemic agents or if controlled with diet and insulin and postprandial blood sugar *not greater* than 200 and not less than 80."

11. In 1985, the plaintiff took and passed the physical portion of the Civil Service examination test required of all candidates for the position of Sanitation Worker. The final results of the examination were made known on June 26, 1986.

12. On June 12, 1986, as part of the individualized medical examination required of all candidates for the position of Sanitation Worker, the plaintiff was required to complete a questionnaire. On this questionnaire, the plaintiff disclosed to the defendant that he has diabetes and is required to take insulin.

13. On January 27, 1987, as part of the medical examination, the plaintiff was required to complete another questionnaire. On this questionnaire, the plaintiff again disclosed to the defendant that he has diabetes, and is required to take insulin.

14. During the course of the medical examination on February 25, 1987, a medical technician for the SmithKline Bio–Science Laboratories, a medical testing laboratory with a laboratory testing contract with the Department of Sanitation, drew blood from the plaintiff in order to conduct a blood sugar test. A fasting blood sugar reading of 183 mg/dl was obtained. A normal fasting blood sugar reading for a man of plaintiff's age would be in the range of 70–115 mg/dl. (A fasting blood sugar reading will normally be lower than a postprandial blood sugar reading and will be more favorable to the plaintiff.)

15. According to the medical history supplied by the plaintiff's personal physician, Eli Ide, M.D., plaintiff's blood sugar levels had ranged from 315 to 260 to 195 mg/dl in the years 1983–1986.

16. Further, in a letter dated July 14, 1988, Eli Ide, M.D. informed the defendant that in the year 1987, plaintiff's blood sugar ranged between 150 and 250 mg/dl.

17. According to plaintiff's treating doctor, in the year 1988, plaintiff's blood sugar ranged from 135 mg/dl to 260 mg/dl.

18. On February 15, 1987, the Department of Sanitation found the plaintiff to be medically not qualified.

19. Testing performed on December 22, 1988 by Bendiner and Schlisinger, Inc., a medical laboratory with a consulting contract with the New York City Department of Personnel, showed plaintiff's fasting blood sugar level to be 252 mg/dl, and his postprandial blood sugar level to be 381 mg/dl.

20. Crediting plaintiff's own medical expert, Dr. Alan P. Braun, plaintiff's poor diabetic control causes him to suffer hypoglycemic reactions at least daily, and that such reactions do impair judgment.

21. Crediting Dr. Braun, a patient's level of control is extremely important in man-

aging the disease of diabetes, a patient's blood sugar readings should not, one hour after eating, exceed 200–220 mg/dl., and any higher levels indicate that a patient is in minimal control.

22. Crediting Dr. Braun, the long term, insidious effects of high blood sugar levels of diabetics in poor control, will result in such employees having a significantly higher incidence of sickness, disabilities and early retirement than diabetics in good control.

23. Crediting Dr. Braun, plaintiff was not in good control of his disease when he examined plaintiff in December, 1988.

24. One of the essential functions of a New York City Sanitation Worker is the operation of a garbage collection truck which weighs up to thirty tons when full, and is approximately thirty feet long. Sanitation Workers generally perform the garbage collection job in a two person team: one worker operating the truck and the other collecting the garbage and loading it into the vehicle. During the tour of duty, the two workers alternate the driving and loading functions.

25. The Department of Sanitation operates garbage collection trucks and other heavy equipment on extremely congested New York City streets. Routes must be completed according to prescribed schedules. Depending on the variable conditions which may prevail, stopping the operation of the truck to obtain food to offset a hypoglycemic reaction might not only be a difficult maneuver, causing congestion of other vehicular traffic, but could also delay completion of scheduled Department of Sanitation work. During the day shift breaks involving the stopping of machinery are permitted only from 9:00–9:15 a.m. and from 1:20 to 1:30 p.m., in addition to the scheduled lunch period.

26. Because a hypoglycemic reaction involves a diminution and even a loss of consciousness, allowing an uncontrolled diabetic such as the plaintiff to operate a garbage collection truck weighing up to thirty tons is inconsistent with considerations of public safety, and the safety of the plaintiff and his co-workers.

27. Other Department of Sanitation vehicles include the mechanical sweeper, the salt spreader and the snowplow. Some vehicles, such as the three-wheeled mechanical sweeper vehicle used in street cleaning operations (one of several models of sweepers used by the City) requires not only driving and maneuvering skills, but also balancing ability, necessitating sanitation workers operating the three-wheeled sweeper to be in a constantly alert, fit state. All models of the mechanical sweeper are operated by a single driver, as are all salt-spreaders and snowplows, and control of any of these vehicles could not be assumed by another individual if the plaintiff were to suffer a hypoglycemic reaction.

28. The salt spreader and snowplow are used in snow removal operations in which virtually all Department of Sanitation workers are expected to participate. It is important to the City's ability to respond to immobilizing weather conditions to have the entire Sanitation work-force available for deployment if the need arises. Snow removal operations are obviously conducted during inclement weather and under difficult street conditions which the snow removal operations are designed to alleviate. Any impairment of alertness while driving a massive snowplow or salt-spreader on snow or ice could lead to a loss of control of the vehicle with disastrous consequences. Because of weather conditions or the required time of operation, stores could be closed and food or emergency medical help difficult to obtain. Deployment of a worker who has uncontrolled diabetes and is subject to frequent hypoglycemic reactions in an emergency snow removal situation is inconsistent with considerations of public safety, and the safety of plaintiff and his co-workers.

29. The plaintiff is an insulin-dependant diabetic in poor control of his disease, who is subject to periodic hypoglycemic reactions and intermediate and long-term debilitation from hyperglycemia, thereby constituting a danger to himself, his fellow workers and the public because of the hazards of the title to which he seeks appointment.

30. Plaintiff was properly disqualified because he failed to meet valid medical standards for the performance of the job of Sanitation Worker, and it was determined that he could not reasonably perform the duties of the position at the time.

31. Plaintiff has demonstrated that the Department of Sanitation receives federal funds so as to confer jurisdiction under 29 U.S.C. § 794. *Doe v. New York University,* 666 F.2d 761, 774 (2d Cir.1981); *Chaplin v. Consolidated Edison Company of New York, Inc.,* 628 F.Supp. 143, 144–45 (S.D.N.Y.1986).

■ 32. In order to establish a prima facie case of discrimination under the Rehabilitation Act of 1973, 29 U.S.C. § 791, *et seq.,* and New York State Executive Law Section 296, the plaintiff must show that (1) he is a "handicapped person" under the Rehabilitation Act and the Executive Law; (2) he was "otherwise qualified" for the position in question; and (3) he was denied the position on the basis of his handicap. *Doe v. New York University,* 666 F.2d 761, 776 (2d Cir.1981); *Matter of Granelle,* 70 N.Y.2d 100, 517 N.Y.S.2d 715, 510 N.E.2d 799 (1987).

33. Plaintiff's diabetes constitutes a handicap under 29 U.S.C. § 706(7)(B); *School Board of Nassau County, Florida v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 1127, 94 L.Ed.2d 307 (1987); *Mahoney v. Ortiz,* 645 F.Supp. 22, 24 (S.D.N.Y.1986).

34. Once an individual has shown that he or she is handicapped, he or she must also demonstrate that he or she is "otherwise qualified"—that is, capable of meeting all of an employer's qualification requirements in spite of his or her handicap. *School Board of Nassau County, Florida v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 1131, 94 L.Ed.2d 307 (1987); *Southeastern Community College v. Davis,* 442 U.S. 397, 406, 99 S.Ct. 2361, 2367, 60 L.Ed.2d 980 (1979); *Doe v. New York University,* 666 F.2d 761, 775, 777 (2d Cir.1981).

■ 35. A handicapped individual must demonstrate that he or she can perform the "essential functions" of the job in question. *Cook v. United States Department of La-* *bor,* 688 F.2d 669, 670 (9th Cir.1982) (per curiam), *cert. denied* 464 U.S. 832, 104 S.Ct. 112, 78 L.Ed.2d 113 (1983); *Doe v. New York University,* 666 F.2d at 775, 777; *Mahoney v. Ortiz,* 645 F.Supp. at 24.

36. In the present case, one of the "essential functions" of the job is the operation of heavy machinery, including garbage trucks which can weigh up to thirty tons, mechanical sweepers, salt spreaders and snowplows. This equipment must be operated continuously along prescribed routes, in a variety of traffic and weather conditions.

■ 37. An employer is allowed to consider potential safety risks to applicants co-workers, and others in making a decision about employment criteria. *Doe v. New York University,* 666 F.2d at 775, 777; *Mahoney v. Ortiz,* 645 F.Supp. at 23; *Bento v. I.T.O. Corp. of Rhode Island,* 599 F.Supp. 731, 742–5 (D.R.I.1984).

■ 38. An employer is not obligated to materially rewrite its job description, to lower or to effect substantial modifications of standards, or to overlook the handicap when the impairment relates to reasonable criteria for employability in a particular position. *Brookhart v. Illinois State Board of Education,* 697 F.2d 179, 184 (7th Cir.1983); *Cook v. United States,* 688 F.2d at 670-1; *Prewitt v. U.S. Postal Service,* 662 F.2d 292, 310 (5th Cir.1981); *Mahoney v. Oritz,* 645 F.Supp. at 24; *Bento v. I.T.O. Corp. of Rhode Island,* 599 F.Supp. at 744, 745.

■ 39. Defendant has demonstrated, based on plaintiff's medical history and current laboratory testing, that the disqualification was based on the valid considerations of safe performance of the duties of the job of Sanitation Worker. *School Board of Nassau County Florida v. Arline,* 480 U.S. 273, 107 S.Ct. 1123, 1131 n. 17, 94 L.Ed.2d 307 (1987); *Mahoney v. Ortiz,* 645 F.Supp. at 24. Plaintiff is not "otherwise qualified for the position of Sanitation Worker, and defendant did not violate 29 U.S.C. § 794 or New York State Executive Law, § 296."

40. Mr. Serrapica relies heavily on the case of *Bentivegna v. United States Department of Labor,* 694 F.2d 619 (9th Cir. 1982). The plaintiff in *Bentivegna,* a "building repairer" for the City of Los Angeles, was terminated after a urine test raised a possibility of lack of diabetic control. *Id.* at 620. The City's justification for the plaintiff's termination was primarily that as a poorly controlled diabetic, the plaintiff faced a higher risk of future injury. However, the City of Los Angeles failed to meet its burden of demonstrating that the medical qualifications for the job were sufficiently related to considerations of business necessity and the safe performance of the job. *Id.* at 622–23. On the issue of the municipality's failure to meet its burden of proof, the court commented: "A requirement more directly tied to increased risk of injury ... might present a different case if applied to applicants for a job that carried elevated risks of injury." *Id.* at 623, n. 3.

41. Similarly, in *Jackson v. Maine,* 544 A.2d 291, 298 (Me.1988) *petition for cert. filed,* 57 USLW 3282 (No. 88–542 Sept. 28, 1988), the Supreme Judicial Court of Maine ruled that the refusal of the Maine Department of Educational and Cultural Services to allow plaintiff, an insulin-dependent diabetic, to take the school bus driver's examination violated 29 U.S.C. Section 794. In that case, the condition of diabetes constituted an absolute bar to the application for employment. *Id.* at 298. The medical testimony offered at trial, unrebutted by the defendant, established that the plaintiff "was free from any condition that might affect his ability to safely operate a school bus." *Id.*

42. But *Bentivegna, supra,* and *Jackson v. Maine, supra,* can be distinguished from the present case because the City of New York more than adequately met its burden of proof in establishing the clear nexus between good diabetic control and the safe performance of the job of Sanitation Worker. A more compelling case is *Davis v. Meese,* 692 F.Supp. 505 (E.D.Pa. 1988), *aff'd without opinion,* 865 F.2d 592 (3d Cir.1989), in which regulations prohibiting insulin-dependent diabetics from em-

ployment as F.B.I. agents were held not to violate the Federal Rehabilitation Act. Expert medical testimony established that the possibility of the occurrence of a severe hypoglycemic reaction could pose a serious risk of damage or harm to co-workers, the public or the individual. *Id.* at 518–19. The "essential functions of a special agent ... require that certain assignments be hazardous, and they would be especially hazardous to a person who is insulin dependent." *Id.* at 519. A proposed accommodation that would place plaintiff on a permanent limited duty would impose an undue hardship on the program and was not required under the Rehabilitation Act. *Id.* at 519–520.

43. In two cases decided under state anti-discrimination law, employers were allowed to bar from employment workers with the condition of diabetes mellitus where the disability created safety risks. In *Spicer v. Martin–Brower Company,* 177 Ga.App. 197, 338 S.E.2d 773 (1985) the Georgia Court of Appeals upheld the dismissal of a worker who had suffered a hypoglycemic reaction at work and was occasionally required to operate fork lifts. In *Kraft v. Bechtel Power Corporation,* 483 So.2d 56 (Fla.App. 3 Dist.1986), a Florida appellate court affirmed the refusal of the Turkey Point nuclear power plant to employ a diabetic, based upon a finding that his medical condition rendered him unable to meet a "bona fide occupational qualification reasonably necessary for the performance of the particular employment."

44. Here, the City's policy on employment of diabetics is more moderate than that of the Federal Bureau of Investigation, *Davis v. Meese, supra,* the Federal Aviation Agency, 14 C.F.R. *See* §§ 67.-13(f)(1), 67.15(f)(1), 67.17(f)(1) (insulin-dependent diabetics may not receive pilot's licenses), or the Interstate Commerce Commission, 49 C.F.R. § 391.41(b)(3) (insulin-dependent diabetics may not operate trucks on interstate highways), and is based on a flexible standard well-supported by medical opinion. An insulin-dependent diabetic may be employed by the Department of

Sanitation if he or she demonstrates average or better levels of diabetic control. As the medical testimony clearly established, a poorly controlled diabetic poses an unpredictable risk of suffering a hypoglycemic reaction on the job, creating hazards to the individual, his or her co-workers and the public. In fact, in this case, defendant established that plaintiff regularly suffers hypoglycemic reactions, and simply could not safely operate the heavy and dangerous vehicles routinely employed by the Department of Sanitation. The City has demonstrated through the evidence the nexus between the medical standards for the position of Sanitation Worker and considerations of safe performance of the job.

Accordingly, the Clerk of the Court is directed to enter judgment in favor of the defendant, and the complaint is dismissed.

SO ORDERED.